| | |
|---|---|
| **LANDMAR, LLC, et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| Vs. ) | ORDER |
| ) | |
| **WELLS FARGO BANK, N.A.,** ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the court on defendant's Motion for Partial Summary Judgment, plaintiffs' Response, and defendant's Reply. A hearing was held on defendant's motion on October 3, 2013. Having carefully considered the briefs, exhibits, and arguments of counsel, the court enters the following findings, conclusions, and Order granting in part and denying in part defendant's Motion for Partial Summary Judgment.

## FINDINGS and CONCLUSIONS

### I. Background

In this action, plaintiffs contend, among other things, that defendant defrauded them in the execution of an "interest rate swap" (hereinafter the "swap") entered into in conjunction with a commercial loan in 2007, which funded the purchase, rehabilitation, and resale of the Country Club Apartments in Mooresville, North Carolina.

In their First Amended Complaint ("FAC"), plaintiffs contend that defendant overcharged them in the swap transaction, FAC ¶¶ 35-51, and that the swap transaction failed of its essential purpose due to the worldwide credit crisis in 2008. Id. ¶¶ 52-66. Based on such contentions, plaintiffs assert the following causes of action:

(1)     Fraud in the Inducement, Duress;[1]

(2)     Fraudulent Overcharges;

(3)     Negligent Misrepresentation;

(4)     Breach of Fiduciary Duty;

(5)     Constructive Fraud;

(6)     Unfair and Deceptive Trade Practices;

(7)     Violation of the Bank Holding Company Act, 12 U.S.C. s§ 1972 & 1975;

(8)     Rescission/Reformation of the Swap Due to Mutual Mistake;

(9)     Rescission/Reformation of the Swap Due to Commercial Frustration of Purpose; and

(10)    Restitution in Equity.

Defendant has moved for summary judgment on all of plaintiffs' state-law claims contending that claims one and two are time barred and that the remainder of the claims lack factual support.

## II.      Factual Contentions

The court has carefully considered all the evidentiary materials referenced by the parties. From such evidence, it appears that the following facts are not in dispute.

At all times relevant to this action, plaintiffs were in the business of redeveloping commercial property for purposes of resale. [2]  Plaintiffs purchased, renovated, and later sold the Country Club Apartments (hereinafter "the apartments") in Mooresville, North Carolina.  Non-party John W. Edwards (hereinafter "Mr. Edwards") was the managing partner of such venture,

---

[1]     Within the First Cause of Action, plaintiffs also appear to raise a claim of fraud by omission through a failure to disclose to plaintiffs a continuing exposure to basis risk despite the swap transaction.  *See* FAC at ¶ 70.

[2]     The court will refer to "plaintiffs" collectively even though only one of the entities actually completed the transaction, inasmuch as such transaction ultimately benefitted both plaintiffs.

and it is undisputed that at the time of disputed transaction, he had approximately 30-years of experience in all aspects of real estate development and the financing of such ventures.

On November 15, 2006, plaintiffs executed a contract to purchase the apartments. To fund such purchase, Mr. Edwards sought financing from Branch Banking & Trust Company ("BB&T"), Wells Fargo, *Prudential Huntoon Paige*, and the seller of the apartments. Due to cost, Mr. Edwards rejected the proposed seller financing as well as the *Prudential Huntoon Paige* proposal. After declining those sources, Mr. Edwards contacted both BB&T and Wells Fargo during March or April of 2007. After each bank conducte some due diligence, both banks provided Mr. Edwards with term sheets.

Mr. Edwards received the Wells Fargo term sheet on April 24, 2007, and the BB&T term sheet on April 27, 2007. Wells Fargo offered a loan at a floating interest rate equal to the bank's one-month LIBOR rate plus 1.50% or at a fixed rate available upon request through an interest rate swap.[3] On April 25, 2007, Mr. Edwards told Linda Adair, his Wells Fargo contact, that he wanted to "go with the variable rate loan."

On May 4, 2007, he spoke with J.P. Conklin, a Wells Fargo derivatives specialist, about the possibility of entering an "interest rate swap" with Wells Fargo. After Mr. Conklin explained a swap to him, Mr. Edwards asked Mr. Conklin to check with Wells Fargo's credit department to see if plaintiffs could enter a swap with Wells Fargo. That same day, Mr. Edwards received a letter from Mr. Conklin that further explained a proposed swap (the "May 4 Letter"). The letter "propose[s] a hedging strategy that would allow [plaintiffs] to hedge against future interest rate increases on [plaintiffs'] floating rate loan." It is undisputed that the letter discusses some of the

---

[3]     At the hearing, the parties were in agreement that while the public can access historic LIBOR rates, including rates from the previous day's trading, only trading banks have access to real-time LIBOR rates. The parties also appeared to agree that LIBOR rates can, within any given trading day, vary in the realm of double-digit basis points.

risks and benefits of hedging a variable rate loan and proposed a forward starting swap, which would become effective on May 31, 2008. During his deposition, Mr. Edwards testified that after he read the letter, he knew that he needed to do his own research with respect to the swap and that he was "on [his] own with respect to the swap."

After receiving the first set of term sheets and negotiating with BB&T and Wells Fargo, Mr. Edwards received BB&T's second term sheet on May 2, 2007, and Wells Fargo's second term sheet on May 14, 2007. Wells Fargo's second term sheet offered plaintiffs a floating rate loan at the banks' one-month LIBOR rate plus 1.50% or a fixed rate available upon request through an interest rate swap. Mr. Edwards executed the Wells Fargo term sheet and faxed it back to Wells Fargo the following day.

On May 30, 2007, Mr. Edwards received an email from Wells Fargo containing an International Swap Dealers Association ("ISDA") Master Agreement and a Schedule to an ISDA Master Agreement as well as other documents that needed to be signed in order for plaintiffs to enter a swap. Plaintiffs executed the Master Agreement and Schedule and these documents were returned to Wells Fargo. Such documents were forwarded by the bank to Palmer Steel, a derivatives analyst who worked with Mr. Conklin. That same day, Mr. Steel emailed Mr. Edwards as follows:

> Hope all is well. We received the signature pages from Mark and can lock the rate for you. Just need to hop on the phone to confirm the details and lock it in. Please feel free to give us a call whenever you have a moment this afternoon.

Edwards Depo. at Ex. 23. Mr. Edwards testified that he does not know whether he called Mr. Steel as requested in the email. The court has gathered from all the evidence presented that it is usual and customary for the bank to confirm the swap deal with a customer by way of a phone

call. In any event, the Swap Agreement was entered between the plaintiffs and defendant later that day.

Entered May 30, 2007, the Swap Agreement was effective May 31, 2007, the following day, instead of May 31, 2008, as provided in the May 4 Letter. Mr. Edwards testified that he did not authorize the entry of a swap with defendant on May 30, 2007. While he does not recall making the confirming call and denies he intended to make the swap effective in 2007 rather than 2008, it is undisputed that Mr. Edwards executed a written Swap Transaction Confirmation dated May 30, 2007, and returned it to defendant on June 13, 2007.

On May 31, 2007, plaintiffs and defendant closed on the loan at the office of plaintiffs' attorney. It is undisputed that, on behalf of plaintiffs, Mr. Edwards signed: (i) a Loan Agreement; (ii) a Promissory Note in Wells Fargo's favor in the amount of $3,880,000.00; and (iii) a Promissory Note in Wells Fargo's favor in the amount of $150,000.00. Mr. Edwards testified that after the closing, Mr. Steel called him at home that same day and told him that plaintiffs had to enter a swap in order for their loan to fund. Based on such call, Mr. Edwards contends that plaintiffs were forced into the swap immediately after the May 31, 2007 closing.

On June 8, 2007, Wells Fargo's document preparation department noticed errors in the $3,880,000 Promissory Note. That Note memorialized a draw loan when the plaintiffs' loan funded at closing, and the Note's variable one-month LIBOR changed daily for one year and then once a month for the remainder of the term. Id. It appears undisputed that other portions of the Note were inconsistent with the forward starting swap proposed in the May 4 Letter and that the method of selecting one-month LIBOR with daily changes for one year and then monthly changes is generally consistent with a forward starting swap, but was inconsistent with the parties' May 30, 2007 Swap Agreement. Later in June 2007, plaintiffs were asked to execute

a second $3,880,000 Promissory Note to correct these errors and Mr. Edwards complied with such request. It is also undisputed that following the closing, plaintiffs were invoiced monthly for payments due under the Swap Agreement, that these invoices totaled approximately $480,000, and plaintiffs paid all of them without comment or protest

On March 31, 2011, plaintiffs terminated the Swap Agreement with defendant. Plaintiffs paid a termination fee of $231,485.

This action was filed on June 15, 2011, in the North Carolina General Court of Justice, Iredell County, Superior Court Division, and removed to this court pursuant to 28 U.S.C. § 1332 based on diversity.

## III.    Summary Judgment: Applicable Standard

Defendant has moved for summary judgment on all of plaintiffs' state-law claims. Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a). The rule goes on to provide procedures for plaintiffs to use in responding to a Motion for Summary Judgment:

> **(c) Procedures.**
> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

**(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return

a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in their favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

## IV.    Discussion

### A.    Introduction

Defendant has moved for summary judgment plaintiffs' claims for fraud and negligent misrepresentation, contending as follows:

> 1. North Carolina's three year statute of limitations, N.C. GEN. STAT. § 1-52(9), bars Plaintiffs' claims for fraud and negligent misrepresentation, first brought on May 27, 2011, to the extent those claims are based upon Plaintiffs' claim that Wells Fargo misrepresented that "Plaintiff could, at any time within the initial twelve-month interest only period of the Loan term, elect to enter into the Swap was a means of fixing the floating rate of interest with respect to the Loan" because Plaintiffs' own evidence is that they knew that alleged misrepresentation, if made, was not true on May 31, 2007, the day that their loan closed and the date upon which Wells Fargo allegedly forced them to enter the swap at issue in this case.
>
> 2. North Carolina's three year statute of limitations, N.C. GEN. STAT. § 1-52(9), bars Plaintiffs' claims for fraud and negligent misrepresentation, first brought on May 27, 2011, to the extent those claims are based upon Plaintiffs' claim that Wells Fargo misrepresented "that the Swap effectively hedges against

future interest rate increases on a floating rate loan" because Plaintiffs' own evidence is that they knew that alleged misrepresentation, if made, was not true in July or August 2007.

3. Plaintiffs' claims for fraud and negligent misrepresentation fail to the extent they are based upon Plaintiffs' claim that Wells Fargo "misrepresented that LIBOR is a suitable proxy for interest rates in financing available to commercial borrowers" because Plaintiffs' own evidence shows that Wells Fargo never made that alleged misrepresentation to them.

4. Plaintiffs' claims for actual fraud and negligent misrepresentation fail because Plaintiffs' own evidence shows that Plaintiffs did not rely upon any of Wells Fargo's alleged misrepresentations.

5. Plaintiffs' claim for fraud by omission fails because Wells Fargo had no duty to disclose any alleged basis risk to Plaintiffs.

6. Plaintiffs' claims for breach of fiduciary duty and constructive fraud fail because a fiduciary relationship is a necessary element of those claims, and no fiduciary relationship existed between Plaintiffs and Wells Fargo.

7. Plaintiffs' claim for unfair and deceptive trade practices, N.C. GEN. STAT. § 75-1.1 ("Chapter 75"), et. seq. fails because the transactions at issue in the First Amended Complaint were capital raising transactions and Chapter 75 claims do not apply to capital raising transactions.

8. Plaintiffs' mistake-based claim fails because the Plaintiffs did not even allege the existence of a mistake justifying rescission or reformation, and Plaintiffs' own evidence shows that Plaintiffs were not mistaken when they entered the swap.

9. Plaintiffs' claim for frustration of purpose fails because frustration of purpose is a doctrine that excuses contractual performance; it is not a cause of action. In addition, the purpose of the swap was not frustrated.

10. Plaintiffs' restitution in equity claim fails because the Master Agreement provides Plaintiffs with no additional equitable remedies against Wells Fargo.

11. Plaintiffs' claims for punitive and treble damages fail because Plaintiffs waived them both in the Promissory Notes that they gave to Wells Fargo.

Motion for Partial Summary Judgment (#39) at 1-3. Apparently, rather than referencing the causes of action (i.e., First Cause of Action, etc.), defendant has elected to tie its motion to the viability of each and every "false and material misrepresentation" claimed by plaintiffs in their Response to Interrogatory 9 of defendant's First Set of Interrogatories. As discussed infra, this has lead plaintiffs to conclude that defendant has not moved for summary judgment based on the statute of limitations as to each cause of action for fraud and negligent misrepresentation. Thus,

the court's first task is to correlate plaintiffs' causes of action with what defendant has called "claims for fraud and negligent misrepresentation."

## A. Claims One, Two, and Three: Plaintiffs' Fraud and Negligent Misrepresentation Claims

Plaintiffs' claims for fraud and negligent misrepresentation appear to be expressed in causes of action one, two, and three,[4] and are captioned in the FAC as follows:

(1)     Fraud in the Inducement, Duress;

(2)     Fraudulent Overcharges; and

(3)     Negligent Misrepresentation.

In turn, plaintiffs have identified four "categories" of false and material misrepresentations of fact that support such claims:

(1)     the "Alleged Timing Misrepresentation;"

(2)     the "Alleged Hedging Misrepresentation;"

(3)     the "Alleged Market Rate Misrepresentation;" and

(4)      the "Alleged Proxy Misrepresentation."

Plaintiffs' Objections and Responses to Defendant's First Set of Interrogatories and Request for Production of Documents (#57), at Response No. 9.

## 1. Motion for Summary Judgment as to Timing and Hedging Claims Based on the Running of the Statute of Limitations

In their motion, plaintiffs contend that the first two categories of false and material representations (timing and hedging misrepresentations) are time barred as to claims one, two, and three.  As a matter of well-settled North Carolina law, claims sounding in fraud and negligent misrepresentation must be brought within three years of discovery of the facts

---

[4]     While Cause of Action Five: Constructive Fraud is a claim of "fraud," such a claim is dependent upon a showing of a fiduciary relationship, making such claim an outlier from  plaintiffs' core fraud claims.

constituting the fraud or negligence. N.C.Gen.Stat. § 1-52(9); <u>Carlisle v. Keith</u>, 169 N.C. App. 674, 683, 614 S.E.2d 542, 548 (2005) (fraud); <u>Branch Banking & Trust Co. v. Chicago Title Ins. Co.</u>, 714 S.E.2d 514, 521 (N.C. App. Aug. 16, 2011) (negligent misrepresentation). Thus, the inquiry is whether there is a genuine issue of material fact as to when plaintiffs discovered the alleged misrepresentations contained in categories one and two.

Review of all the evidence submitted reveals that Mr. Edwards knew of the so-called "Timing Misrepresentation" not later than May 31, 2007, the day he testified he was forced into the swap:

> Q.    And you [knew] that Ms. Adair's statement to
>       you was a lie on May 31st, 2007, right?
> A.    After the fact, yes.
> Q.    But on that day, right?
> A.    Yes.

Edwards Depo. at 75 (#40-2). The three year statute of limitation as to the timing misrepresentation began to run May 31, 2007, and had expired by nearly a year when plaintiffs caused to be issued a civil summons in the state court on May 27, 2011.

As to the Hedging Misrepresentation, Mr. Edwards testified that he knew of the falsity of that representation not later than August 2007:

> Q.    … You said Adair misrepresented that the  swap
>       effectively hedged against future rate increases, right?
> A.    (Nods head.)
> Q.    When did you first know that this statement was
>       a misrepresentation?
> A.    I felt it was a misrepresentation when I saw my
>       payments increase.
> Q.    When did that happen?
> A.    That happened beginning 60 days after the
>       loan.
> Q.    So somewhere around August 2007?
> A.    Yes, July/August.
>              ***
> Q.    How about Mr. Conklin? When did you --when did

> you know that his misrepresentation that the swap
> would effectively hedge against future rate
> increases was, in fact, a misrepresentation?
>
> A.    Well, at about the same time.
>
> Q.    So July/August 2011?
>
> A.     Right….
>
>                \*\*\*
>
> Q.    So that's when you knew he made a misrepresentation
> to you?
>
> A.    Right.
>
> Q.    How about Mr. Steele? Same question: When did
> you know that Mr. Steele misrepresented to you that
> the swap would effectively hedge against future rate increases?
>
> A.    At about the same time for the same
> reasons.

Id. at 91, 92, and 93. Thus, to the extent that Claims One, Two, and Three are based on the alleged timing and hedging misrepresentations, such claims are time barred.

\*\*\*

Plaintiffs also argued that the statute of limitations had not run due to a "continuing violation," which they appear to contend occurred each time they paid an invoice. Generally, North Carolina courts have held that "[i]n certain circumstances, the limitation period may be tolled by application of the 'continuing wrong' doctrine. 'A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." Blythe v. Bell, 2013 WL 440701 (N.C.Super. Feb. 4, 2013) (citations omitted). In Hinson v. United Financial Servs., Inc., 123 N.C.App. 469 (1996), the North Carolina Court of Appeals held in the context of monthly late notices, "[p]laintiff's attempt to equate the singular wrong involved in the procurement of the not, with wrongs applicable to the continued course of treatment doctrine in medical malpractice actions, is misplaced." Id. at 474-475 (citation omitted). The appellate

court went on to hold that "[s]ending a late notice is, at worst, an ill effect of the original wrong and is not a wrong in and of itself." Id. at 475. Here, it is undisputed that defendant sent monthly invoices, which plaintiffs consistently paid without protest, and the court cannot see how such can be considered as anything other than "an ill effect of the original wrong" in procuring the promissory note in 2007. Thus, the continuing wrong doctrine has no application in these circumstances and will not operate to toll the statute of limitations.

### 2. Motion for Summary Judgment as to Alleged Proxy Misrepresentation

Defendant next contends that it is entitled to summary judgment on the fourth category of false and material representations, the "Proxy Misrepresentation," as to Claims One, Two, and Three, because plaintiffs can produce no evidence that such misrepresentation was ever made. Here, the alleged "Proxy Misrepresentation" was that agents of defendant told plaintiffs that LIBOR was a suitable proxy for interest rates available to commercial borrowers.

The essential elements of a claim of fraud by misrepresentation are: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage. Jolly v. Acad. Collection Serv., 400 F.Supp.2d 851 (M.D.N.C. 2005). To satisfy the specificity requirements of Rule 9(b), it is plaintiff's obligation to plead the time, place, and contents of the false representations, as well as the identity of the person making the representation and what such person obtained thereby. In order to plead fraud by omission, a plaintiff must allege and, on summary judgment, be able to prove the following:

> (1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those

defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

Breeden v. Richmond Community College, 171 F.R.D. 189, 195 (M.D.N.C. 1997) (citations omitted).

At his deposition, Mr. Edwards was asked whether Ms. Adair "misrepresented that LIBOR is a suitable proxy for interest rates and financing available to commercial borrowers." Id. at 110 and 111. In response to that question, Mr. Edwards testified that Ms. Adair said "it was going to be based on LIBOR without qualification." Id. at 111. Further, he admitted that Ms. Adair said that the adjustable rate loan would be "based on the floating LIBOR rate," id., that such rate "would have been used for the swap as well," id., and "that the loan was going to be based on it, so to go to your suitability, my assumption was, that's suitable." Id. at 112. As to what Mr. Conklin told him, Mr. Edwards testified that "it was going to serve as the basis [LIBOR] and you know, I had no choice to pick another index, and I had to assume this was suitable." Id. at 112. As to the representations made by Mr. Steel, Mr. Edwards testified that he said "the LIBOR rate was a suitable rate they were all using and that the transaction would be based on." Id. at 113. He then testified that Mr. Steel said "[LIBOR] was their index. It was the index they were using, the bank was using." Id. at 113. Mr. Edwards further testified that in his opinion "it was suitable. They didn't give me a choice between indexes that were more or less suitable. It was one suitable index." Id. at 113.

Taking plaintiffs evidence in a light most favorable to them, defendant, through its agents, told Mr. Edwards that its swap offerings were based on LIBOR, that it would not base a swap with plaintiff on any other index, and that LIBOR was a suitable index for the bank. Plaintiffs have produced no evidence that defendant represented that LIBOR was a suitable

proxy for interest rates available to commercial borrowers.  Thus, there is no evidence to support plaintiffs' claim that defendant made a fraudulent or negligent misrepresentation concerning LIBOR as a proxy for rates available to commercial borrowers.

As noted above, plaintiffs' First Cause of Action, read broadly, may also contain a sub-contention or claim of negligent omission.  To the extent plaintiffs may be contending that failure to disclose that LIBOR is *not* a suitable proxy for rates available to commercial borrowers, the omission of such a fact concerning the nature of LIBOR was, at best, a negligent omission and a negligent *misrepresentation* claim cannot be grounded upon an alleged omission. Bonham v. Wolf Creek Academy, 767 F.Supp.2d 558, 570 (W.D.N.C. 2011).    Also, to the extent plaintiffs are claiming that defendant failed to disclose the risk that rates for a future fixed rate loan could increase while one-month LIBOR decreased, see FAC, ¶¶70-72, which is what occurred during the Great Recession of 2008, plaintiffs have failed to come forward with any evidence that defendant had a duty to make such prognostication and disclose it to borrowers.

Such a duty would, in any event, be dependent of some confidential relationship between lenders and borrowers or counterparties to a swap agreement. Plaintiffs have not shown that defendant was a fiduciary, that defendant took affirmative steps to conceal material facts, or that defendant had knowledge of a latent defect in the loan product it sold to plaintiffs.  No fiduciary duty arises in the context of a borrower-lender relationship. Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 60-61 (1992).    It is undisputed that defendant explicitly told plaintiffs that they would have to do their "own research" in deciding whether to go into a swap, and that plaintiffs actually knew they were "on [their] own" as to the swap.  Edwards Depo. At 124, 125, 133, 138, 139, and 140.    Plaintiffs contend that defendant implied that a swap transaction was not subject to basis risk, FAC ¶ 71, and plaintiffs' expert points to the May 4,

2007, letter from defendant, for the proposition that defendant represented that plaintiffs "can even use a swap to lock in a fixed rate in advance of its loan closing." Arapoglou Depo. at 170 (#40-9). However, the relevant portion of the letter provides, as follows:

> Flexible Risk Management: Subject to any hedging requirements under the loan, Hamilton could enter into an interest rate swap at any time, for any term, on any portion of its variable rate debt. This allows Hamilton to specifically tailor its swap to match any amount and time frame it wishes to hedge. In contrast, on a fixed rate loan, the interest rate is fixed at closing for the full principal amount of the loan.
> Hamilton can even use a swap to lock in a fixed rate in advance of its loan closing. Please be aware, however, that any swap is a separate contract and would be an ongoing obligation whether or not the loan takes place. The risk of the swap being unnecessary (because the loan never materializes or for other reasons) should be carefully considered by Hamilton before entering into a swap to lock in a rate.

Defendant's Ex. 11 at 2 (#58-1). A letter which discusses hedging variable rate debt is not evidence that defendant concealed anything. Read in its entirety, the letter discourages any plan to hedge possible subsequent fixed rate financing using the swap.

In addition, plaintiffs have presented no evidence of a latent defect in the swap inasmuch as hedging against a possible *future fixed rate* does not appear to be part of the swap. It is undisputed that the swap hedged the basis risk of a *variable rate debt.* There is no evidence that defendant knew of that purported risk or its presence as a "latent defect" in the swap transaction at issue in this case. Further, North Carolina courts which have addressed the issue have determined that banks have no duty to notify a borrower or counterparty of the basis risk alleged herein. Press Communications, LLC v. Wachovia Bank, N.A., Order ¶30 09 CVS 21335 (N.C.B.C. May 1, 2013) (unpublished). While plaintiffs disagree with the Business Court's decision, this court finds it to be highly persuasive.

Summary judgment will, therefore, be granted to defendant on causes of action one, two, and three to the extent such causes of action are based on plaintiffs' alleged proxy misrepresentation.

### 3. Motion for Summary Judgment as to Alleged Market Rate Misrepresentation

While it is clear that defendant has moved for summary judgment on causes of action one, two, and three as to the third category of fraud and negligent misrepresentation, the alleged "Market Rate Misrepresentation," some confusion has arisen as to whether defendant has satisfied its initial burden under Rule 56. This dispute is highlighted in defendant's Reply brief, where it notes as follows:

> Although they recognize that Wells Fargo moved to dismiss their Alleged Market Rate Misrepresentation claims, Plaintiffs' Brief at 10-11, Plaintiffs assert that Wells Fargo conceded that same claim presented genuine issues of material fact. *Id.* Where such a concession was made by Wells Fargo remains a mystery.

Reply (#50) at 6, fn. 4. While defendant correctly states that plaintiffs identified four categories of fraud and/or misrepresentation, and that the Motion for Summary Judgment seeks dismissal of all of those categories, the argument in its Brief in Support of Summary Judgment does not in any distinct part specifically address the claim for "Alleged Market Rate Misrepresentation."

Instead, defendant's argument addresses the Statute of Limitations as to the first two categories of fraud/misrepresentations, but does not address the Statute of Limitations as to the third category of "Alleged Market Rate Misrepresentation" or the fourth category for "Alleged Proxy Misrepresentation." The argument then addresses the merits of the fourth category as well as an additional claim of fraud by omission. In its Reply brief, defendant points to pages 5 and 11 of its Brief in Support of Motion for Summary Judgment and argues that Mr. Edwards

testified that he entered the swap because he was told that the loan would not fund without it and that he had already committed to purchase the property.  Defendant argues in its reply that such "concession eliminates Plaintiffs' arguments that they relied upon any alleged misrepresentation by Wells Fargo, including the Alleged Market Rate Misrepresentation."  The court has reviewed the pages noted by defendant: page 5 of the Brief in Support of Summary Judgment contains a recitation of facts, but contains no argument and page 11 does not use the phrase "Alleged Market Rate Misrepresentation" at any point, but does argue therein that because plaintiffs "did not rely upon the alleged fraudulent and/or negligent statements by Wells Fargo, their claims for actual fraud and negligent misrepresentation fail."   Brief in Support (#40) at 11.

As masters of their Motion for Summary Judgment, it is important for the moving party to be clear as to the basis for its motion. Here, defendant approached summary judgment by addressing its arguments to the categories of fraud and/or misrepresentation identified during discovery, with general reference to the actual causes of action.  While it is likely that defendant intended to argue that causes of action one, two, and three are in their entireties time barred, it appears to the court that defendant only argued that such causes of action are time barred as the first two categories.  Clearly, defendant seeks summary judgment on the merits of the fourth category and, as made clear ion the Reply, also seeks summary judgment on the merits of the third category, as discussed infra.

*** 

As to the third category, plaintiffs argue that there is a genuine issue of material fact and that summary judgment is not warranted as to the third category.  Plaintiffs assert that they have presented evidence on which they could prevail in the form of testimony from Mr. Edwards that "he relied on the representations that the Bank was charging him the market rate."  Response

(#44) at 11 (citing Mr. Edwards' Deposition at 98-99). At best, the testimony of Mr. Edwards on the pages cited stand for the proposition that Mr. Edwards believed that the "market rate" for the loan was "whatever Palmer Steel told me." Edwards Depo (#45-3) at 98 & 99. Evidence tending to show that Mr. Edwards *believed* that the rate quoted was the "market rate" is not the same as evidence that someone actually represented to him that he was to receive "the market rate." Moreover, plaintiffs' assertion that they would be afforded the "market rate" for LIBOR defies logic for persons of ordinary business acuity, much less Mr. Edwards, who has engaged in complex commercial transactions for 30 years. A claim that the term "market rate" means the live-level rate available on the real-time interdealer bank rate for LIBOR with no profit added to it, would mean that plaintiffs contend that that they were told by the bank that they would receive an interest rate at the rate the bank paid when it borrowed from other banks, to wit, that defendant agreed to engage in a swap without making a profit. Caper Corp. v. Wells Fargo Bank, N.A., 2013 WL 4504450 (E.D.N.C. Aug. 22, 2013). In Caper Corp., the district court held that

> Caper fails to plausibly allege any misrepresentation by Wells Fargo. Although Caper alleges that Wells Fargo offered an interest rate swap at a "market rate" or a "market-derived rate," Caper does not allege that Wells Fargo or any bank representative specifically offered Caper the interdealer broker market rate. The phrase "market-derived rate" implies something other than a market rate. Even viewing the complaint in the light most favorable to Caper, the alleged facts state nothing more than conjecture on Caper's part that Wells Fargo's offer of a "market rate" or "market-derived rate" meant the interdealer broker market rate, as opposed, for instance, to the market rate for the bank's commercial customers or the market rate for a customer with Caper's credit profile.

Id. at 10. As was the case in Caper Corp., such a favorable no-profit term is simply beyond comprehension, even for a bank's most favored customers, and there is absolutely no evidence that plaintiffs had any banking relationship with defendant prior to this action. In Caper Corp., the district court held that almost identical allegations "amount to an allegation that Wells Fargo,

by uttering the phrase "market rate," misled Caper into believing that the bank was offering Caper direct access to a market open only to the largest commercial and investment banks at no cost to Caper, without considering Caper's creditworthiness and with no benefit accruing to Wells Fargo ." Id. Thus, to the extent that Mr. Edwards may have relied on statements he perceived as representations that defendant would not make a profit on the swap, such reliance was neither reasonable nor justifiable. RD & J Props. v. Lauralea–Dilton Enters., 165 N.C.App. 737, 600 S.E.2d 492, 499 (2004) (affirming summary judgment where plaintiff failed to forecast evidence that its reliance was reasonable and emphasizing that the parties were sophisticated businesspersons dealing at arm's length); Caper Corp., 2013 WL at 6 (finding that "[t]he "question of justifiable reliance [for negligent misrepresentation claims] is analogous to that of reasonable reliance in fraud actions.") (citation omitted).

While what is "reasonable" is inherently subjective and usually an issue for a jury to decide, Restatement (Second) of Torts § 552 cmt. e (1977), the facts as presented here would not allow a jury to find in plaintiffs favor on such a claim, as such would require a jury to determine that defendant agreed or represented that it would not make a profit on the swap transaction, a conclusion found implausible by the court in Caper Corp.. Id.

Summary judgment will, therefore, be granted as to Causes of Action One, Two, and Three to the extent those claims are based on an alleged "Market Rate Misrepresentation."

**B.    Claims Four and Five: Plaintiff's Fiduciary Duty and Constructive Fraud Claims**

Plaintiffs also contend in separate allegations that defendant breached its fiduciary duty in its dealings with plaintiff and engaged in constructive fraud. As discussed above, plaintiffs have failed to present any evidence of  a fiduciary relationship between them and defendant. .  See also Marketic v. U.S. Bank Nat. Ass'n, 436 F.Supp.2d 842, 855 (N.D.Tex.2006) (no fiduciary

duty between mortgagor and mortgagee); <u>Paradise Hotel Corp. v. Bank of Nova Scotia</u>, 842 F.2d 47, 53 (3rd Cir.1998) (no fiduciary duty between customer and lender because lender is necessarily on the other side of the negotiating table); <u>Nat'l Westminster Bank, U.S.A. v. Ross</u>, 130 B.R. 656, 678–79 (S.D.N.Y.1991), <i>aff'd,</i> 962 F.2d 1 (2d Cir.1992) (no fiduciary relationship between borrower and lender absent extraordinary circumstances).

As a matter of law, there is no fiduciary relationship between a lender and a borrower under North Carolina law. <u>Branch Banking & Trust v. Thompson</u>, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992) ("The mere existence of a debtor-creditor relationship between the parties does not create a fiduciary relationship.") Further, the Court of Appeals for the Fourth Circuit recognized in <u>South Atlantic Ltd. P'ship of Tenn. L.P. v. Riese</u>, 284 F.3d 518, 533 (4th Cir. 2002), that

> North Carolina is reluctant to impose 'extracontractual fiduciary obligations' in the context of general commercial contracts; thus, even when parties to an arms-length transaction have reposed confidence in each other, no fiduciary duty arises unless one party thoroughly dominates the other.

<u>Id.</u> (citation omitted); <u>See also</u> <u>Smith v. GMAC Mortg. Corp.</u>, 2007 WL 2593148, at *6 (W.D.N.C. Sept. 5, 2007). Further, plaintiffs have made no plausible allegations and presented no evidence that defendant "thoroughly dominated" them in the transaction.

The failure to present evidence of an extant fiduciary relationship is also fatal to plaintiffs' claim of constructive fraud. "To assert a claim of constructive fraud, plaintiff must allege: (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." <u>Clay v. Monroe</u>, 189 N.C.App. 482, 488 (2008) (citation omitted and corresponding quotation marks deleted). There being no fiduciary duty between these parties, plaintiffs have failed to state a claim for constructive fraud.

Summary judgment will be granted on these claims.

C.    **Claim Six: Unfair and Deceptive Trade Practice Act**

Defendant seeks summary judgment on plaintiffs' UDPTA claim arguing that the North Carolina Court of Appeals has held that the UDTPA is inapplicable as to transactions entered into to raise capital.   Defendant further points to a decision by the North Carolina Business Court, which specifically applied this exception to a claim where a swap was entered into in conjunction with a loan.   In response, plaintiffs contend that these decisions are wrong and should not be followed by this court.

Sitting in diversity, this court must decide the issue not based on its own views of what the law should be, but on how it believes the North Carolina Supreme Court would decide the issue if it had presented to that Court.   <u>Food Lion, Inc. v. Capital Cities/ABC, Inc.</u>, 194 F.3d 505, 512 (4th Cir. 1999).   In making such determination, opinions issuing from the North Carolina Court of Appeals are "persuasive in situations where the [North Carolina Supreme Court] has not spoken..." <u>Sanderson v. Rice</u>, 777 F.2d 902, 905 (4th Cir. 1985).   This court must follow such intermediate appellate decision unless it "is convinced" that the North Carolina Supreme Court would rule to the contrary.   <u>Id.</u>   As to decisions of the North Carolina Business Court, this court gives that court's written opinions careful and deliberate consideration.

In <u>Oberlin Capital, L.P. v. Slavin</u>, 147 N.C. App. 52, 62 (2001), the North Carolina Court of Appeals held that the UDTPA does not apply to "capital raising" transactions, including loans from financial institutions.   Following <u>Oberlin Capital</u>, the North Carolina Business Court has held that the UDTPA does not apply to swaps entered into in conjunction with capital raising loans. <u>Press Communications, Inc. v. Wachovia Bank, N.A.</u>, Case No. 09-CVS-21335 (N.C.B.C. April 12, 2010), Order on Motion to Dismiss; <u>Latigo Investments II, LLC v. Waddell & Reed Financial, Inc.</u>, 2007 WL 2570753 *5 (N.C.B.C. May 22, 2007) (Diaz, J.) (unpublished).

The court does not yet need to decide whether the North Carolina Supreme Court would overrule Oberlin Capital, because the Business Court's decisions which relied on the appellate court's decision do not convince this court, at least at this point, that the interest rate swap transaction in this case was itself a "capital raising" transaction. In Latigo Investments, Judge Diaz, after noting that he joined with Justice Martin in his concerns with the logic of Oberlin Captial, id. at *4, ¶ 47,[5] found that he was bound to follow that decision, and held that "the only relevant question for me is "whether the transactions at issue involved securities or other financial instruments involved in raising capital." Id. at ¶48 (citing White v. Consol. Planning, Inc., 166 N.C.App. 283, 304 (2004)). While this court has given careful and deliberate consideration to the trial court's opinions in Press Communications and Latigo Investments, which may well carry the day, the court finds that such day has not yet come as there is a genuine issue of material fact as to whether the swap transaction (which plaintiffs contend they were forced to enter on the day of closing for the loan to fund) was a capital raising transaction. The court will deny the Motion for Summary Judgment as to this claim without prejudice as to revisiting the issue through a properly raised Rule 50(a)(2) motion made at the close of plaintiffs' evidence at trial.

### D. Claim Eight: Mutual-Mistake

Plaintiffs also appear to seek rescission and/or other relief based on what they contend was a mutual mistake in undertaking a swap based on the one-month LIBOR plus the credit spread. FAC at ¶128. Rescission contemplates that each party will be restored to the status it had before the contract was entered. American Mortg. Network, Inc. v. Shelton, 486 F.3d 815, 820 (4th Cir. 2007); Brannock v. Fletcher, 271 N.C. 65, 74-75 (1967). A mutual mistake

---

[5]     "Were I writing on a clean slate, I would not dismiss Plaintiffs' UDTPA claim as, like Justice Martin, I find no logical basis for excluding misrepresentations made in the context of capital raising transactions from the reach of what is intended to be a broad remedial statute." Latigo Investments, 2007 WL at * 4, ¶47.

sufficient to justify rescission is defined as a mistake common to both parties and concerns a material past or presently existing fact, such that there is no meeting of the minds. <u>Howell v Waters</u>, 82 N.C.App. 481, 486, 347 S.E.2d 65, 69 (1986).

To state a claim for mutual mistake, a plaintiff must show that the mistake "existed at the time the parties entered into the contract." <u>AMEX Assurance Co. v. Caripides</u>, 179 F.Supp. 2d 309, 321 (S.D.N.Y. 2002), <u>aff'd</u> 316 F.3d 154 (2nd Cir. 2003). A "party's prediction, or judgment as to events to occur in the future, even if erroneous is not a mistake." <u>Hartford Fire Ins, Co. v. Federated Dept. Stores</u>, 723 F.Supp.976, 994 (S.D.N.Y 1989). The mistake must enter into and form "the basis of the contract, or in other words it must be of the essence of the agreement, the *sine qua non*, or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties." <u>Howell</u>, 82 N.C.App. at 486 (<u>quoting</u> <u>MacKay v. McIntosh</u>, 270 N.C. 69, 73-74 (1967)).

The alleged mutual mistake is that "one-month LIBOR plus the credit spread in the Swap Transaction was a rational and fundamentally sound choice for a floating rate, which represented a free market rate at which solid and stable financial institutions lend money." FAC at ¶128. As a matter of law, such alleged mutual mistake is entirely dependent on market reversals few, if any, perceived. There is absolutely no evidence that defendant perceived such market reversal in May of 2007. In <u>Caudill v. Manufacturing Co.</u>, 258 N.C. 99 (1962), the North Carolina Supreme Court held that a "mistake in prophecy, or in opinion, or in belief relative to a future event ... is not such a mutual mistake." <u>Id</u>. at 103 (discussing mutual mistake in the context of a settlement agreement). There is no issue of fact as to whether, at the time of the swap, the "one-month LIBOR was a rational and fundamentally sound choice for a floating rate index to employ in the Swap Transaction." FAC at ¶53.

Inasmuch as plaintiffs' claim of mutual-mistake is based on events that transpired well after the swap, defendant is entitled to summary judgment on such cause of action as a matter of well settled North Carolina law.

### E.  Claim Nine: Frustration of Purpose

Plaintiffs appear to assert a claim for "frustration of purpose," which is, as a matter of law, a *defense* to a claim excusing contractual performance, not an affirmative cause of action. Brenner v. Little Red School House, Ltd. , 302 N.C. 207, 211 (1981) (recognizing that the doctrine of frustration of purposed is an affirmative defense); Crossman v. Life Care Centers of America, Inc., 738 S.E.2d 737 (N.C. Ct. App. 2013).  Thus, summary judgment will be granted as plaintiffs fail to state a cognizable claim.

Even if such a claim existed, it would be without merit.  The district court in Caper Corp., supra, addressed a nearly identical claim holding that the swap in that case was not useless:

> In its ninth claim, Caper seeks rescission or reformation of the Swap Agreement due to commercial frustration of purpose and mutual mistake resulting from artificial depression of the LIBOR. Compl. ¶¶ 146–52. Frustration of purpose, however, applies only "when a change in circumstances makes one party's performance virtually useless to the other." Morpheus Capital Advisors LLC v. UBS AG, 105 A.D.3d 145, 148, 962 N.Y.S.2d 82, 85 (2013); PPF Safeguard, LLC v. BCR Safeguard Holding, LLC, 85 A.D.3d 506, 508, 924 N.Y.S.2d 391, 394 (2011). Here, the interest rate swap was not useless. Rather, the swap functioned as intended by protecting Caper from potentially high variable interest rates and providing Caper fixed interest payments rather than unpredictable, variable interest payments. Caper paid the amount of interest it agreed to and expected to pay under the Swap Agreement. Thus, the contract's purpose was not frustrated.

Id., 2013 WL at *12.

In this case it is undisputed that by entering into the swap, plaintiffs received a fixed rate loan carrying an interest rate of 6.97% on their underlying $3,880,000 variable rate obligation to Wells Fargo until March 2009.  At that point, plaintiffs ceased to have an effective fixed rate

due to an increase in the default rate on their variable rate loan, as to which there is no evidence linking such to the swap. Thus, plaintiffs' have not shown that it has evidence on which it could prevail if such cause of action existed.

**F.    Claim Ten: Restitution in Equity Claim**

Based on language contained in Section 3(a)(v) of the Swap Master Agreement, plaintiffs assert a claim for "Restitution in Equity." Section 3(a)(v) provides as follows:

> Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that: Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

Defendant's Ex. 24 at 3. Apparently, this paragraph is standard language in an ISDA master agreement and while possibly providing parties with equitable *defenses,* defendant has shown that no court has ever held that this provision provides any party with an affirmative claim. Plaintiffs have cited the court to no supportive decisions and the court can find none. Summary judgment will be granted and this claim will be dismissed.

**G.    Punitive and Treble Damages Claims**

Defendant has moved for summary judgment on plaintiffs' punitive and treble damages claims, arguing that plaintiffs waived such claims in the Promissory Note. While it is clear that the parties mutually waived their rights to seek exemplary damages in any action that may arise out of the Note or any documents or agreements related to such Note, plaintiffs have not asserted a "cause of action" for punitive damages. Instead, such request is contained in the *ad damnum* portion of the FAC.

North Carolina does not recognize a "cause of action" for punitive damages. Instead, punitive damages may be sought in an *ad damnum* clause or a prayer for relief for damages for some other tort that would support punitive damages. As a matter of state law, "punitive damages" is not a cause of action, but is instead a remedy available in very limited circumstances.

> As a general rule, "[p]unitive damages do not and cannot exist as an independent cause of action, but are mere incidents of the cause of action and can never constitute a basis for it. If the injured party has no cause of action independent of a supposed right to recover punitive damages, then he has no cause of action at all." J. Stein, *Damages and Recovery* § 195 at 389 (1972). North Carolina follows this general rule of law.

Hawkins v. Hawkins, 101 N.C.App. 529, 532 (1991). In North Carolina,

> punitive damages may be awarded only if a claimant proves that the defendant is liable for compensatory damages and that the defendant is guilty of fraud, malice, or willful or wonton conduct.

Combs & Associates, Inc. v. Kennedy, 147 N.C.App. 362, 374 (2001) (citation omitted).

Further, it appears that

> Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, and managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages.

Phillips v. Restaurant Management of Carolina, L.P., 146 N.C.App. 203, 215- 16 (2001) (citation omitted). In North Carolina, the aggravating factors that will justify imposition of punitive damages are set forth by statute: "(1) fraud, (2) malice, or (3) willful or wanton conduct." N.C. Gen.Stat. § 1D-15(a).

That said, it appears that plaintiffs, in executing the Note, have bargained away certain rights to seek punitive or treble damages. The only question which remains is the scope of that waiver. The relevant language contained in the Note provides a waiver as to any claim that "may

arise out of or be in any way connected with this agreement, the loan documents or any other agreement or document between or among them or the obligations evidenced hereby or related hereto ...." Defendant's Ex. 29 at 5 (emphasis deleted). In arguing that such language is inapplicable to the swap agreement, plaintiffs point to the merger clause of the ISDA Master Agreement, which provides that "[t]his Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." ISDA Master Agreement § 8(a). Plaintiffs further point to Section 5(j) of the ISDA Master Agreement, which provides that the swap is an "independent obligation . . . separate and apart from any . . . loan or other financing...." Id. at 5(j). Close review of the facts of this case indicate that the Master Agreement was signed May 30, 2007, and that the first Promissory Note was signed May 31, 2007, at closing. Thus, the Note is not a "prior writing" under Section 8(a) of the ISDA Master Agreement.

Based on the evidence presented, the court cannot say with certainty that the swap is either included or excluded by the waiver. While defendant cites, among other cases, to the district court's decision in Wachovia Bank, Nat. Ass'n v. Preston Lake Homes, LLC, 750 F.Supp,2d 682 (W.D.Va. 2010), for upholding an identical waiver, that court's decision was not unqualified:

> However, Preston Lake claims that the waiver is only effective as to Preston Lake's breach of contract claims, and does not bar Preston Lake from seeking punitive damages relating to its tort claims. But, as noted above, the court grants Wachovia's motion to dismiss those tort claims. Accordingly, the court also grants Wachovia's motion to dismiss Preston Lake's claim for punitive and consequential damages.

Id. at 693. While plaintiffs have not forwarded a similar argument, at least one of plaintiffs' tort claims – the UDTPA claim – has survived summary judgment, for now, and could carry with it

exemplary damages if the claim is successful. On the other hand, the language of the waiver is sweeping and would appear to include contractual and tort claims alike as it provides for "any claim," Defendant's Ex. 29 at 5 (emphasis deleted).

Thus, the court does not yet have sufficient evidence or arguments before it to foreclose plaintiffs from seeking punitive or treble damages. The court will be in a better position to consider such at trial at the conclusion of plaintiffs' evidence, and if the request for punitive damages survives, the court could isolate any damage that could ensue from allowing the punitive damages request to proceed through bifurcation of the evidence on the merits of plaintiffs' claims and the request for punitive damages. This request for summary judgment will, therefore, be denied without prejudice as to raising it again in the form of a Rule 50(a)(2) motion.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion for Partial Summary Judgment (#39) is **GRANTED** in part and **DENIED** in part as herein provided.

This matter is reset for trial during the court's February 2014 civil trial term.

Signed: October 16, 2013

Max O. Cogburn Jr.
United States District Judge